UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                  )
SEATON INSURANCE COMPANY          )
f/k/a Unigard Mutual Insurance    )
Company,                          )
                                  )
          Plaintiff,              )
                                  )
     v.                           )    C.A. No. 08-542 S
                                  )
YOSEMITE INSURANCE COMPANY,       )
                                  )
          Defendant.              )
_____)

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, United States District Judge.

This diversity action centers on two reinsurance agreements that originated in the 1970s between Plaintiff Seaton Insurance Company (hereinafter "Seaton")[1] and Defendant Yosemite Insurance Company (hereinafter "Yosemite"). Plaintiff filed suit for breach of contract, alleging that after twenty-odd years of paying claims on the two policies, Yosemite suddenly got cold feet. Yosemite responded by counterclaiming that the agreements were void from the start and should be rescinded.

The parties have now filed cross-motions for summary judgment, which allow the Court to clear away most claims on both sides. Although Plaintiff's claims under one of the

---

[1] Plaintiff Seaton Insurance Company was formerly Unigard Mutual Insurance Company, but is referred to as Seaton throughout this opinion for simplicity.

policies must be dismissed, its claims under the second policy present a material fact dispute that requires a trial. And while Defendant is entitled to a declaratory judgment that it owes Plaintiff nothing further under one policy, its counterclaims for breach of contract must be dismissed, because they are barred under California law. Accordingly, for the reasons fully explained below, both motions must be granted in part and denied in part.

I.   Background

A.   The reinsurance agreements

Except as noted, the following facts are undisputed.

1.   Formation

There are two reinsurance contracts at issue. For the period from October 1, 1973, to October 31, 1975, Seaton issued excess umbrella liability insurance (the "Champion Policy") to Champion International ("Champion"). For the period from April 1, 1973 to January 1, 1976, Seaton issued excess umbrella liability insurance (the "Westinghouse Policy") to Westinghouse Electric Corporation ("Westinghouse").

Allen, Miller & Associates, Inc. ("Allen Miller") served as Seaton's managing general agent ("MGA") with respect to the Champion and Westinghouse Policies. In that role, Allen Miller communicated with Yosemite, on behalf of Seaton, to procure the reinsurance contracts, described below, for both policies.

However, Allen Miller also served as MGA for Yosemite in the 1970s. Other than that, there is no evidence concerning what role Allen Miller might have played for Yosemite in the Champion and Westinghouse transactions. (See Pl.'s Statement of Undisputed Material Facts ¶¶ 13-14, Apr. 8, 2010, ECF No. 43 (hereinafter "Pl.'s Facts"); Def.'s Statement of Disputed Facts ¶¶ 13-14, Apr. 30, 2010, ECF No. 50 (hereinafter "Def.'s Disputed Facts").)

For the Champion Policy, Yosemite agreed to provide $1 million in reinsurance, effective October 31, 1973. On January 24, 1974, Allen Miller issued an "Information" form "for Facultative Reinsurance." The "information" form did not reference any amount of risk that Seaton would be required to retain for itself, instead of ceding to other reinsurers, and the form had no place on it for any such requirement. On January 28, 1974, Yosemite created a facultative certificate for the reinsurance of $1 million of risk under the Champion Policy (the "Champion Certificate"). The Champion Certificate was written on Yosemite's form. The front of the form displays a section titled "Details of Reinsurance Afforded," with a series of boxes. The box labeled "Reinsurance Accepted" describes the risk taken by Yosemite as "$1,000,000 P/O $4,000,000 EXCESS OF $1,000,000." (See Def.'s Statement of Undisputed Material Facts ¶ 47, Apr. 30, 2010, ECF No. 49 (hereinafter "Def.'s Facts").)

The Westinghouse Policy provides excess umbrella liability coverage with limits in the amount of $10.75 million, which were part of a $48 million layer of excess insurance, which in turn sat above $58 million in underlying insurance procured by Westinghouse. (See Pl.'s Facts ¶ 33; Def.'s Disputed Facts ¶ 33.) Seaton first ceded $8.75 million of its $10.75 million share to several facultative reinsurers, and the remaining $2 million to its corporate reinsurance treaties. Subsequently, Seaton reached out to Yosemite, which agreed to reinsure $2 million of the Westinghouse Policy. (See Pl.'s Facts ¶¶ 36-38; Def.'s Disputed Facts ¶¶ 36-38.)

As a result, Seaton transferred the last $2 million of risk on the Westinghouse Policy from its reinsurance treaties to Yosemite. While the parties disagree exactly when Seaton first placed that $2 million in treaties, it is clear that, at the time Seaton approached Yosemite, Seaton "retained none of the risk, ceding $8.75 [million] to several facultative reinsurers and . . . $2 million to reinsurance treaties." (See Def.'s Disputed Facts ¶ 35.)

To memorialize the agreement, Yosemite first issued a binder form that mistakenly transcribes the Policy amount as $42 million, instead of $48 million. The binder describes Yosemite's "reinsurance accepted" as "$2 MILLION PART OF $10.75 MILLION PART OF $42 [sic] MILLION EXCESS of $58 MILLION." (See

4

Pl.'s Facts ¶ 39.)  Like the "Information" form for the Champion Policy, the Westinghouse binder does not refer to any retention requirement.  Next, on February 27, 1975, Yosemite issued a facultative certificate for the Westinghouse Policy (the "Westinghouse Certificate"), using the same form as the Champion Certificate.  The Westinghouse Certificate sets forth the "REINSURANCE ACCEPTED" by Yosemite as "$2,000,000. PART OF $10,750,000. PART OF $42,000,000. [sic] EXCESS OF $58,000,000. EXCESS OF UNDERLYING." (See Def.'s Facts ¶ 15.)

The flashpoints for the present dispute are boxes titled "Company Retention," which appear on the front of both the Champion and Westinghouse Certificates.  According to Yosemite, these designate the amount of risk that Seaton pledged to keep for itself, rather than cede to other reinsurers.  The Champion Certificate states that Seaton's "Company Retention" is "4,000,000 EXCESS OF $1,000,000." (See Def.'s Facts ¶ 47.)  The Westinghouse Certificate records Seaton's retention as "8,750,000. PART OF $10,750,000. PART OF $42,000,000. [sic] EXCESS OF $58,000,000. EXCESS OF UNDERLYING." (See Def.'s Facts ¶ 15.)

The backs of both Certificates contain standard retention warranties that were customary for Yosemite with its reinsurance policies in the 1970s.

B. RETENTION OF THE COMPANY. This reinsurance is
accepted in reliance on the Company's not reducing its
net interest in original policy loss or liability as
determined by the amount specified in Item 3.
(Company Retention). Should the Company Retention be
reduced by reinsurance or otherwise without notice to
the Reinsurer (except as the Company Retention may be
covered by non-specific excess of loss catastrophe
reinsurance applying to more than one of the Company's
policies in a single event), the Reinsurer's liability
for loss otherwise fully collectible hereunder shall
be determined in accordance with the following:

(Pl.'s Facts ¶ 30(a).) Section B. (2) provides that:

If this reinsurance is on a pro rata (or quota
share) basis: THE COMPANY WARRANTS THAT IT WILL RETAIN
as the Company Retention the amount stipulated in Item
3 (except as noted therein). If at the time of loss
the Company's actual retention shall be less than the
amount stipulated in Item 3, the reinsurance hereunder
shall be void either from inception or when later, the
date on which the reduction took place, and the
Company and the Reinsurer shall each return to the
other any remittances for loss or premium made
following such date.

(See Def.'s Facts ¶ 16.)

Seaton did, in fact, obtain reinsurance for the Champion

and Westinghouse Policies other than what it procured through

Yosemite. For the Champion Policy, "Seaton facultatively

reinsured at least $2.75 million of the $4 million excess $1

million of its policy." (Def.'s Facts ¶ 51; Pl.'s Statement of

Disputed Facts ¶ 51, May 24, 2010, ECF No. 56 (hereinafter

"Pl.'s Disputed Facts").) Seaton also reinsured $500,000 of the

first $1,000,000 on the Champion Policy pursuant to a "Quota

Share Excess and Special Risks Reinsurance Treaty." (Ex. 22 to

Affidavit of Nicholas C. Cramb, Apr. 30, 2010, ECF No. 51, (hereinafter "Cramb Aff."); see Declaration of Clement S. Dwyer, Jr., ¶¶ 7-9, May 14, 2010, ECF No. 58 (hereinafter "Dwyer Decl.") (discussing the reinsurance structure on the Champion Policy).) Other portions of the Champion Policy were subject to several treaty reinsurance contracts maintained by Seaton. For the Westinghouse Policy, as indicated above, Seaton "admits that, effective from January 1, 1975 . . . the limits of the [Policy] were fully reinsured by other facultative and treaty reinsurance." (Pl.'s Disputed Facts ¶ 19.)

According to Seaton, much of the documentary record surrounding the formation of the agreements is lost. However, it points to a page of notes in its underwriting file that is allegedly a handwritten facultative certificate for the Westinghouse Policy signed by R.L. Snyder ("Snyder") of Yosemite on January 28, 1974. One line on the page states, "[Seaton] Participation: 2 mill," next to which is a notation in different handwriting that says, "OK R.L. Snyder Yosemite Ins. Co. 12-5-74." (Ex. 11 to Declaration of Andrea Giannetta, Apr. 8, 2010, ECF No. 44 (hereinafter "Giannetta Decl.").) Yosemite disputes that Snyder signed the document, and does not concede that it shows Yosemite knew about any additional reinsurance obtained by Seaton.

2.   Course of performance

Over the next two decades or so, Seaton billed Yosemite, and Yosemite paid, approximately $447,903 under the Champion Policy and approximately $18,000 under the Westinghouse Policy. Sometime in October 1986, Yosemite's President, Robert Brown, began to make inquiries regarding the specifics of Champion-related claim submissions. On May 20, 1992, Seaton's claims manager at the time provided a reconciliation of amounts paid and then due from Yosemite. Similarly, on April 27, 1993, the claims manager provided a summary and reconciliation of various claims that comprised Seaton's "aggregate claim" for Champion and requested that Yosemite pay $7,883.15. In response to a request from Yosemite, the claims manager reported that, as of December 18, 1996, Yosemite had been billed a total of $387,176.52, which represented Yosemite's share of ultimate net loss. (See Pl.'s Facts ¶¶ 55, 65-77.)

Also, since 1985 Seaton continued to send claim updates to Yosemite, each entitled "Report to Interested Reinsurers." On November 20, 1985, Seaton's R.W. Maydahl reported to "Interested Reinsurers" regarding a class action against Champion covered by the Policy. The report was expressly copied to Yosemite and three additional reinsurers or reinsurance intermediaries. On May 25, 1988, Seaton's claims manager reported to "Interested Reinsurers" that Seaton was maintaining a $0 indemnity reserve

for the Westinghouse Policy. Yosemite audited the Westinghouse file on February 14, 2001, July 9, 2003, January 19, 2006, and July 26, 2007. (See Pl.'s Facts ¶ 76; Def.'s Disputed Facts ¶ 76.)

Yosemite does not admit that it received all of this correspondence, and does not possess all of the documents discussed above in its files, even though they were addressed to Yosemite.

In 2007, Yosemite ceased paying any billings on the Champion and Westinghouse claims. On April 1, 2008, Robert McDonnell of Yosemite made first mention to Seaton of any alleged violation of the retention warranty, stating:

> In our review of the [Seaton] files we have noted that additional reinsurance was purchased by [Seaton] concerning its insurance on Champion International, without notifying Yosemite.

(See Pl.'s Facts ¶ 87; Def.'s Disputed Facts ¶ 87.)

B.    Procedural History

Seaton insists that it has complied with all contractual requirements, and therefore that Yosemite remains obligated under the reinsurance agreements. It therefore filed this action for breach of contract. Seaton seeks damages to cover Yosemite's outstanding liability under the reinsurance agreements and a declaratory judgment that Yosemite must make all future payments. Yosemite responds by contending that both

contracts are void because Seaton failed to comply with the retention warranties in the Champion and Westinghouse Certificates. Yosemite thus asserts counterclaims for the return of its payments since the 1970s. It also requests a declaratory judgment that Seaton must give back those funds, and that Yosemite owes nothing further on either Policy.

The parties have completed discovery and now cross-move for summary judgment on both the Complaint and the counterclaims.

II. Legal Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56. "A genuine issue of fact exists where the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009) (internal quotations and citation omitted). The Court must view the facts "in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." Estrada v. Rhode Island, 594 F.3d 56, 59 n.2 (1st Cir. 2010); see St. Paul Fire & Marine Ins. Co. v. VDE Corp., 603 F.3d 119, 122 (1st Cir. 2010) (stating the standard for reviewing a grant of summary judgment).

The parties agree that the law of California governs the interpretation of the reinsurance contracts.

III. Seaton's claims for breach of contract and declaratory relief

Seaton seeks to demonstrate that the reinsurance agreements are valid, and bind Yosemite to make all pending and future payments. To do so, Seaton must prove that it did not disobey its own contractual duties by failing to retain enough risk on the Champion and Westinghouse Policies. While most of Seaton's strategies fail, it does marshal enough evidence to create a fact dispute about whether it complied with the Westinghouse Certificate, and thereby preserved Yosemite's duties to pay reinsurance under that document. However, there can be no dispute that Seaton failed to abide by the Champion Certificate, and thereby terminated Yosemite's duty to pay any claims on the Champion Policy. For those reasons, which are more fully explained below, Seaton's claims on the Westinghouse Policy must go to trial, but its claims on the Champion Policy cannot survive.

A. Modification of the Certificates through course of dealing

The Certificates on which Yosemite relies in repudiating the contracts do not tell the whole story, according to Seaton. The entire course of dealing between the parties, Seaton vows, demonstrates that Seaton was entitled to pursue additional reinsurance. Since the merits of this attack expose the

weaknesses of Seaton's other arguments, it is most efficient to begin the analysis here.

Seaton is correct that "[f]acultative reinsurance contracts are not integrated agreements." United Fire & Cas. Co. v. Arkwright Mut. Ins. Co., 53 F. Supp. 2d 632, 642 (S.D.N.Y. 1999). Rather, for these types of contracts,

> [t]he mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract.

Med. Ins. Exch. of Cal. v. Certain Underwriters at Lloyds, London, No. C 05-2609 PJH, 2006 WL 463531, at *14 (N.D. Cal. Feb. 24, 2006). Some courts have even concluded that the boxes showing retained and ceded portions of risk on facultative reinsurance certificates are ambiguous as a matter of law. See Commercial Union Ins. Co. v. Swiss Reinsurance Am. Corp., 413 F.3d 121, 128 (1st Cir. 2005) (describing a "reinsurance accepted" provision as "simply cryptic"). For these reasons, the Court accepts Seaton's contention that it should consider extrinsic evidence to fully understand the bargains between the parties. See TIG Premier Ins. Co. v. Hartford Acc. & Indem. Co., 35 F. Supp. 2d 348, 350 (S.D.N.Y. 1999) (looking to

extrinsic evidence to determine the meaning of facultative reinsurance certificates under California law).

The need to look beyond the Certificates, however, does not make them disappear. However ambiguous those documents may be, Seaton does not contend that they are not part of the agreements between the parties. Thus, while the parties' course of dealing might shed light on what the "Company Retention" boxes mean, it cannot abolish them. See Inamed Corp. v. Medmarc Cas. Ins. Co., 258 F. Supp. 2d 1117, 1123 (C.D. Cal. 2002) ("Under California law, a written instrument is presumed to express the true intent of the parties.") Indeed, as one case cited by Seaton explains:

> If the parties to a contract have, for years, harmoniously performed the contract in a way that reflects a particular, reasonable, understanding of the terms of the contract, that performance is relevant to determining the meaning of the contract.

Emp'rs Reinsurance Co. v. Super. Ct., 74 Cal. Rptr. 3d 733, 746 (Cal. Ct. App. 2008) (emphasis added). This means that extraneous evidence can only advance Seaton's claims to the extent that it reflects a "particular, reasonable understanding" of the contractual terms, including those in the Certificates.[2]

---

[2] In Emp'rs Reinsurance, the court noted that the California codification of the Uniform Commercial Code also permits extrinsic evidence to "show a waiver or modification of any term inconsistent with the course of performance." Emp'rs Reinsurance Co. v. Super. Ct., 74 Cal. Rptr. 3d 733, 745 (Cal. Ct. App. 2008). The use of such evidence is subject to statutory restrictions in contractual disputes governed by the UCC. See Cal. Com. Code §§ 1303(f), 2209 (West 2010). Seaton

### 1. Champion

It is true that the face of the Champion Certificate cries out for extrinsic evidence to decipher its terms, because the "Details of Reinsurance Afforded" section contains an obvious mistake. It displays Seaton's "Company Retention" as "4,000,000 EXCESS OF $1,000,000." (<u>See</u> Def.'s Facts ¶ 47.) Yosemite acknowledges that this is wrong, because Yosemite itself, by the same Certificate, agrees to take a $1 million share of the "4,000,000 EXCESS OF $1,000,000" portion of the policy. (<u>Id.</u>) Thus, it would be impossible for Seaton to retain the entire $4 million. However, according to Yosemite, the best way to read the "Company Retention" box is that Seaton agreed to bear the remaining $3 million of risk in that $4 million layer.

Seaton seizes on the error, and proposes that the Certificate only commands Seaton to hold $1 million. Moreover, Seaton proclaims, its correspondence with Yosemite "confirm[s] that the Champion Policy was reinsured by a program of facultative and treaty reinsurance, and Seaton's 'retention,' was the initial $1 million layer." (Pl.'s Mem. in Support of Summ. J. 8, Apr. 8, 2010, ECF No. 42, (hereinafter "Pl.'s Mem.").)

does not argue that this is a UCC case, or that Seaton can satisfy the requirements of § 2209 of California's Commercial Code, which must be met to demonstrate modification of contractual terms that contradict the course of performance. <u>See</u> <u>id.</u>

According to Seaton, the reconciliations of accounts under the Champion Policy it sent to Yosemite between 1992 and 1996 bear out the $1 million figure.  Several of these statements calculate Yosemite's liability by taking a percentage of the total net loss "Less [an] Underlying" amount of $1 million. (See Pl.'s Facts ¶ 55 (a)(iii), (b)(ii).)  Another accounting performs the same math, but instead of designating the $1 million as "Underlying," it uses the term "Retention."  (See id. ¶ 55(d)(i).)  In addition, in June 1993, Seaton's claims manager informed Yosemite that, for a particular part of the Policy period, "we are still within the $1 million underlying retention."  (Id. ¶ 55(c)(iii).)

The "Reports to Interested Investors" allegedly sent to Yosemite in the 1980s, Seaton continues, tell a similar story. They too, says Seaton, demonstrate that it was required to retain less than $3 million.  The reports refer to "68.75% facultative [reinsurance] placement on the $4 million [excess of] $1 mm layer."  (Id. ¶ 58(c)(ii).)  Since Yosemite's share of the $4 million layer was only $1 million, or 25%, Seaton reckons, the obvious conclusion was that "there were facultative reinsurers for the other 43.75%" of the 68.75% that was reinsured.  (Pl.'s Mem. at 9.)  And yet, all the while, Seaton stresses, Yosemite continued to pay claims under the Champion Policy.

Even assuming the "particular" meaning of the contract is that Seaton was supposed to retain the first $1 million,[3] Yosemite pinpoints a critical flaw in Seaton's argument. Seaton did not even retain the "initial $1 million layer" that it holds up as its true commitment. (Pl.'s Mem. at 8.) Pursuant to the Quota Share Excess and Special Risks Insurance Treaty, Seaton reinsured $500,000 of the bottom $1 million layer. (See Ex. 22 to Cramb Aff.; Dwyer Decl. ¶ 7-9.)

In its opposition to Yosemite's motion for summary judgment, Seaton attempts to maneuver around this problem by shifting its theory of what the Certificate and course of dealing mean. It now claims that "[t]he Champion Certificate does not state that the retention must be satisfied solely out of the first $1 million layer of the Champion Policy, and there is simply no requirement that Seaton do so." (Pl.'s Mem. in

---

[3] If Seaton did not have to retain $4 million, or $3 million pursuant to the "Company Retention" box, what "particular" amount did the parties agree it would keep? Just the "$1 million underlying retention," as indicated in the reconciliations? Or some greater amount? Judging by the "Reports to Interested Reinsurers," one might reasonably presume that Seaton kept not only the first $1 million, but also the remaining 31.25% of the $4 million which had not been "facultative[ly] place[d]." That would have added $1.25 million to the risk on Seaton's books. The point is that even if the later documentary record undermines Yosemite's interpretation of the original Certificate, it falls short of demonstrating "objective manifestations" of the parties' "mutual intention[s]" with respect to what amount Seaton had to retain. Med. Ins. Exch. of Cal. v. Certain Underwriters at Lloyds, London, No. C 05-2609 PJH, 2006 WL 463531, at *14 (N.D. Cal. Feb. 24, 2006).

Further Support of Summ. J. and in Opp'n to Def.'s Mot. for Summ. J. 45, May 24, 2010, ECF No. 55 (hereinafter "Pl.'s Opp.").) Therefore, Seaton asserts, it satisfied the retention requirement because it retained some risk in the lower $1 million layer, and some risk in the upper $4 million layer, which "at all times" totaled $1 million or more. (Id.)

This is an about-face. It contradicts not only Seaton's initial motion — which, again, attests that "Seaton's 'retention' was the initial $1 million layer" — but the interpretation first advanced by its own employee, and even its own expert. At deposition, Andrea Giannetta of Seaton testified that she understood the parties agreed that Seaton would "retain that first million dollars for its own account." (Deposition Testimony of Andrea Giannetta 138:13-16, Dec. 29, 2009, Ex. 1 to Cramb Aff. (hereinafter "Giannetta Tr.").) Moreover, the report filed by Seaton's expert Clement S. Dwyer, Jr., presents the Champion Policy as consisting of two separate layers. Seaton, Dwyer explained, retained the first layer of $1 million, but nothing in the second layer of $4 million. The report explicitly refers to "[Seaton's] $1,000,000 retention over which the $4,000,000 layer attached." (Am. Expert Report of Clement S. Dwyer, Jr. § 6.9(c), Dec. 4, 2009, Ex. 20 to Cramb Aff. (hereinafter "Dwyer Rep't") (emphasis added).)

Seaton's inconsistency underscores that its revised theory is unreasonable. The Champion Certificate, like Seaton's expert's report, divides the Champion Policy into two layers, by describing the policy limits as "$4,000,000 EXCESS OF $1,000,000." (Def.'s Facts ¶ 47.) Nothing in the Champion Certificate even arguably implies that Seaton can mingle risk from those two layers as it pleases for purposes of retaining $1 million. As a result, only by rewriting the Certificate, or by ignoring the "Company Retention" box altogether, could the Court find that Seaton was permitted to do what it did. See Martin Marietta Corp. v. Ins. Co. of N. Am., 47 Cal. Rptr. 2d 670, 678 (Cal. Ct. App. 1995) ("[A]n interpretation that gives effect to every clause is preferred over one that would render other policy terms meaningless.").[4]

---

[4] The fact that Seaton's expert has now submitted an affidavit sanctioning Seaton's new argument does not create a material fact dispute about what the Champion Certificate means. (See Declaration of Clement S. Dwyer, Jr. ¶ 9, May 14, 2010, ECF No. 58 (hereinafter "Dwyer Decl.").) With due respect to Mr. Dwyer's expertise in matters of reinsurance, Seaton's new contention is so facially implausible that the Court can reject it under straightforward principles of contract interpretation. Moreover, Seaton cannot avoid summary judgment by enlisting its expert to devise a new theory of how to read the Certificate. See Gallagher v. S. Source Packaging, LLC, 568 F. Supp. 2d 624, 631 (E.D.N.C. 2008) (explaining that courts disallow supplemental expert disclosures that amount to "gamesmanship," because parties cannot "avert summary judgment by 'supplementing' an expert report with a 'new and improved' expert report"); see also Hartford Ins. Co. v. Gen. Elec. Co., 526 F. Supp. 2d 250, 253 (D.R.I. 2007) (stating that experts

True, one "Report to Interested Reinsurers" states that "there is a 50% facultative placement on the first $1 million and a 68.75% facultative placement on the $4 million [excess of] $1 mm layer." (Pl.'s Facts ¶ 58(c)(ii).) But none of the reports spell out the premise that Seaton can draw from either the bottom or top layer to satisfy an agreed-upon amount of retained risk. They thus are not specific enough to qualify as an "objective manifestation" of Yosemite's intent to let Seaton do that. Medical Ins. Exch. of Cal., 2006 WL 463531, at *14.

For these reasons, the course of dealing does not show how the reinsurance Seaton purchased could have been authorized under the Champion agreement. It therefore gives Seaton no traction on its Champion claims.

### 2. Westinghouse

The inquiry is simpler for the Westinghouse contract. The Westinghouse Certificate dictates that Seaton would retain "$8,750,000. PART OF $10,750,000. PART OF $42,000,000. [sic] EXCESS OF $58,000,000. EXCESS OF UNDERLYING." (See Def.'s Facts ¶ 15.) There is, again, no dispute that Seaton actually retained none of the $8.75 million specified in the Certificate. (See Pl.'s Disputed Facts ¶ 19.) Whatever the extraneous evidence about the parties' course of dealing for the

cannot use supplemental disclosures to "introduce wholly new opinions").

Westinghouse Policy might show, there can be no "reasonable understanding" of the Westinghouse Certificate by which "$8,750,000" actually means zero.[5] The course of dealing is thus of no use to Seaton on its Westinghouse claims either.

B.  Reformation due to mutual mistake

Seaton has no greater success in arguing that the Court should reform the Champion and Westinghouse Certificates because they are the product of a mutual mistake by the parties. As Seaton observes, "[t]he purpose of reformation is to correct a written instrument in order to effectuate a common intention of both parties which was incorrectly reduced to writing." Alderson v. Ins. Co. of N. Am., 223 Cal. App. 3d 397, 411 (Cal. Ct. App. 1990) (quotation marks and citation omitted). "To justify the court in changing the language of the instrument sought to be reformed, it must be established that both parties

---

[5] Seaton highlights the lack of a retention requirement in the original binders issued by Yosemite, but the significance of that fact is equivocal. It is just as easy to conclude that the binder does not address retention one way or the other as it is to assume that the binder contradicts the Certificate. And without more, the handwritten notes from Seaton's file that allegedly show Yosemite approved the absence of any retention cannot replace the "$8,750,000" notation on the Certificate with a "particular, reasonable" understanding that Seaton did not have to hold on to any risk. True, that document may support Seaton's argument about what Yosemite must have deduced when it agreed to take a $2 million share. However, the meaning of the document is not clear on its face, and the argument depends, as explained below, on a degree of supposition. Thus, while the handwritten notes are relevant to the issue of notice, they cannot serve as an "objective manifestation" of mutual intent. Med. Ins. Exch. of Cal., 2006 WL 463531, at *14.

agreed to something different from what is expressed in the writing, and the proof upon this point should be clear and convincing." Lister v. Sorge, 260 Cal. App. 2d 333, 338 (Cal. Ct. App. 1968) (quotation marks, citation, and internal alterations omitted); accord Inamed Corp. v. Medmarc Cas. Ins. Co., 258 F. Supp. 2d 1117, 1123 (C.D. Cal. 2002).

Because of the need for "clear and convincing" evidence to establish a mutual mistake, the deficiencies in Seaton's modification argument resound with even greater force in this context. Reformation would make no difference unless the Court rewrote the Certificates to allow Seaton to retain no risk on the Westinghouse Policy, and $1 million total in risk on the Champion Policy by drawing from the $1 million layer and the $4 million layer at its discretion. For all the reasons already explained, the extraneous evidence does not support the conclusion that the parties shared those "particular" understandings. Emp'rs Reinsurance, 74 Cal. Rptr. 3d at 746. A fortiori, then, no reasonable jury could conclude that there was "clear and convincing" evidence that the parties held "common intention[s]" that would validate Seaton's actions, yet mistakenly wrote something different in the Certificates. See Alderson, 223 Cal. App. 3d at 411.

C.   Notice

The discussion above establishes that Seaton cannot prove the "Company Retention" portions of the Certificates must be modified to permit the additional reinsurance it obtained.  The next question, then, is whether Seaton's actions violated the terms of the retention warranties contained in the Certificates.

The warranties provide, in relevant part:

> This reinsurance is accepted in reliance on the Company's not reducing its net interest in original policy loss or liability as determined by the amount specific in item 3.  (Company Retention).  Should the Company Retention be reduced by reinsurance or otherwise without notice to the Reinsurer . . . , the Reinsurer's liability for loss otherwise fully collectible hereunder shall be determined in accordance with the following . . .

(See Def.'s Facts ¶ 16 (emphasis added).)  The warranties go on to equip Yosemite with remedies in the event that Seaton drops below its stipulated retention without notice.

The crucial point is that only reductions "without notice" to Yosemite trigger those remedies.  That means that if Seaton provided "notice" to Yosemite of the other reinsurance it purchased, there would be no violation of the retention warranties.  In that event, Yosemite's duty to pay reinsurance would remain in effect under the Certificates, and Seaton would be entitled to judgment on its claims.

To give proper notice, at a minimum it is clear that Seaton would have had to provide "disclosure upon reduction" of

retained risk. Int'l Surplus Lines Ins. Co. v. Fireman's Fund Ins. Co., No. 88 C 320, 1989 WL 165045, at *2 (N.D. Ill. Dec. 29, 1989) (discussing the notice provision in a retention clause in a reinsurance certificate). Thus, Seaton would at least have had to tell Yosemite of the other reinsurance at the time it was purchased. Or, if the other reinsurance deals were completed before Yosemite got involved, Seaton had to divulge that fact when it entered the contract with Yosemite, and not later. This would give Yosemite the opportunity either knowingly to consent to the change or renegotiate before it took effect. In the absence of any other contractual specifications or legal authority, the only reasonable understanding of "notice" in this context is that it must be (i) timely; and (ii) specific enough to identify the size of the reduction in the "Company Retention."[6]

1. Notice under the Westinghouse Certificate

In light of the debate between the parties about what Yosemite knew when it issued the Westinghouse Certificate, a reasonable jury could find that Yosemite was aware of, and

---

[6] The only other data point about "notice" presented by the parties is that, as Yosemite observes, Seaton's expert testified that he would be "reluctant" to classify the claims correspondence from the 1980s and 1990s discussed above as proper notice. (Deposition Transcript of Clement S. Dwyer, Junior 145:12-17, Jan. 14, 2010 (hereinafter "Dwyer Dep.") Ex. 3 to Cramb Decl.) That, however, is not enough to secure judgment for Yosemite on Seaton's claims regarding the Westinghouse Policy in light of the fact dispute discussed below.

consented to, the additional reinsurance Seaton purchased. Specifically, disagreements about the following evidence raise questions of material fact to be resolved by a jury:

(a) The parties dispute whether the timing and context of the formation of the Westinghouse agreement demonstrate that Yosemite must have known Seaton reinsured the entire Policy. Seaton points out that Yosemite accepted the Westinghouse risk in early 1975, after the Policy had been in effect for nearly two years. (See generally Def.'s Facts ¶¶ 6-10.) Yosemite also admits that, at the time it issued the Westinghouse Certificate, Seaton "retained none of the risk, ceding $8.75 [million] to several facultative reinsurers and $2 million to reinsurance treaties." (Def.'s Disputed Facts ¶ 36.) According to Seaton's expert, "nobody takes a risk midterm, without asking who else is on this risk and how have the terms been set." (Deposition Transcript of Clement S. Dwyer, Junior 96:4-12, Jan. 14, 2010 (hereinafter "Dwyer Tr."), Ex. 54 to Declaration of Mark D. Hoerrner, Apr. 8, 2010, ECF No. 45 (hereinafter "Hoerrner Decl.").) In fact, some testimony from Yosemite's expert, Edwin M. Millette, could reasonably be taken to suggest that the type of diligence Seaton's expert described is customary when taking on a risk mid-term. (See Deposition Transcript of Edwin M. Millette 85:15-87:18, Jan. 20, 2010 (hereinafter "Millette Tr."), Ex. 4 to Hoerrner Decl.)

(b) The parties dispute whether it would have been reasonable to expect that Seaton could shoulder $8.75 million in risk for one policy, because it was a relatively small company. Seaton contends that "Yosemite would have known that Seaton would not risk such a large percentage of its limited policyholder surplus on a single risk by retaining $8.75 million for its own account unreinsured." (Pl.'s Opp. at 34.) As Seaton's expert testified, Yosemite would "have to say, wait a minute, this doesn't make any sense, because the risk is too big. It violates what was then, you know, rules that the commissioners generally had in effect in the United States, that companies didn't put more than ten percent of their net worth on any one risk, on a gross basis." (Dwyer Tr. 99:18-100:4.)

(c) The parties dispute the meaning of the handwritten notes from Seaton's file with the notation, "[Seaton] Participation: 2 mil," next to which is a notation in different handwriting that says, "OK R.L. Snyder Yosemite Ins. Co. 12-5-74." (Ex. 11 to Giannetta Decl.) Seaton asserts that the document was either signed by Snyder, or at a minimum shows that someone at Seaton recorded Snyder's approval of Yosemite's assumption of the last $2 million in risk on the Westinghouse Policy. Yosemite retorts that the document is from Seaton's internal file, was not signed by Snyder, and should not be taken as evidence that Yosemite agreed to any other reinsurance.

These arguments, however, go to weight and credibility; they do not suffice to reject the document as immaterial.

The testimony and handwritten notes discussed above provide circumstantial evidence that Yosemite was aware of the additional Westinghouse reinsurance at the time it issued the Certificate. Based on that evidence, a reasonable jury could conclude that Yosemite did, in fact, enter the contract knowing that Seaton had reinsured all of the other $8.75 million. Yosemite thus cannot obtain summary judgment on Seaton's claims based on the Westinghouse Policy, because a genuine dispute of material fact remains about whether Seaton avoided a breach of the retention warranty by providing "notice" of its reduced risk.

> 2. Notice of a reduction in retained risk for the Champion Policy

Unlike with the Westinghouse Certificate, Seaton cannot take advantage of the "notice" provision in the retention warranty for the Champion Certificate. Most of the evidence regarding Yosemite's awareness of Seaton's other reinsurance on the Policy dates from the 1980s and 1990s. Seaton holds up the account reconciliations and the "Reports to Interested Reinsurers" as giving Yosemite a full picture of Seaton's risk profile for the Champion Policy. But since the Champion agreement dates from 1974, that claims correspondence cannot

qualify as "disclosure upon reduction" of retained risk. Int'l Surplus Lines Ins., 1989 WL 165045, at *2. Telling Yosemite that Seaton dropped below its stipulated retention years after the fact is not adequate notice.

Furthermore, Seaton's argument that Yosemite had "constructive notice" of its program of reinsurance for Champion from the very beginning does not work. It rests on the theory that, because Allen Miller served as one of Yosemite's MGAs in the 1970s, Allen Miller had a duty to share Seaton's reinsurance purchases for the Champion Policy with Yosemite. On that basis, Seaton reasons that Yosemite is "deemed to have notice of whatever" Allen Miller knew. See Riddle v. Aneiro (In re Aneiro), 72 B.R. 424, 427 (Bankr. S.D. Cal. 1987) (quoting Cal. Civ. Code § 2332 (West 2010)).

This would be true if Allen Miller had represented Yosemite with respect to the Champion Policy, but Seaton cannot prove this is the case. The fact that, according to one Yosemite employee, Allen Miller was the "biggest" MGA used by Yosemite in the 1970s does not, on its own, establish that either the Champion or Westinghouse deals fell within Allen Miller's authority for Yosemite. (Pl.'s Facts ¶ 14.) Seaton relies on the absence of evidence to the contrary, but Seaton bears the burden of proof on its claims. Thus, the facts that, as Seaton observes, Yosemite's underwriting file for Champion is

"inconclusive as to the role played by Allen Miller" (Pl.'s Disputed Facts ¶ 3), and that Yosemite "lost its underwriting file" for Westinghouse (id.), count against Seaton on this issue. See Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991) ("[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim."). Seaton therefore lacks sufficient evidence from which a reasonable jury could conclude that Allen Miller represented Yosemite on either the Champion or Westinghouse deals.

On the other hand, there is no dispute that Allen Miller represented Seaton on both transactions. (See Def.'s Facts ¶¶ 2-3, 6, 41; Pl.'s Disputed Facts ¶¶ 2-3, 6, 41.) The only reasonable conclusion, then, is that Allen Miller was actually adverse to Yosemite for purposes of the Champion and Westinghouse agreements. This means Allen Miller's knowledge "is no more to be imputed to the principal than to an utter stranger." Redman v. Walters, 88 Cal. App. 3d 448, 454 (Cal. Ct. App. 1979) (internal quotation marks and citation omitted). "While in general the knowledge of an agent which he is under a duty to disclose is to be imputed to the principal, it is well established that where the agent acts in his own interest or [w]here the interest of the agent is adverse to his principal,

the knowledge of the agent will not be imputed to the principal." People v. Park, 151 Cal. Rptr. 146, 154 (Cal. Ct. App. 1978); see Witty v. Clinch, 279 P. 797, 798 (Cal. 1929) ("[T]he [imputed knowledge] rule is inapplicable where . . . the agent, in the particular transaction in question, is acting in an adverse interest to that of his principal.").

Indeed, even if Seaton could prove Allen Miller acted as a dual agent with respect to the transactions at issue, this would not suffice to impute its knowledge to Yosemite. Under California law, the mere fact that Allen Miller brokered the deals for Seaton would still defeat the imputed knowledge doctrine.[7] In Park, the record "show[ed] that [the agent] was a double agent." Id. at 154. The court reasoned that since the agent therefore "had a clear adverse interest in the matter, his knowledge was not imputable" to the principal. Id.; cf.

---

[7] The only California cases indicating that imputed knowledge might be appropriate in situations of dual agency involve specific rules for escrow agents, which are not applicable here because Allen Miller was not an escrow agent. See, e.g., Gregg v. Cloney (In re Marriage of Cloney), 91 Cal. App. 4th 429, 440-41 (Cal. Ct. App. 2001) (finding that an escrow agent's knowledge should be imputed to a principal). In any event, Seaton could not take advantage of such decisions even if the Court were inclined to apply its logic to these facts. Whether the knowledge of an escrow agent acting in a dual agency capacity must be imputed to a principal depends on a close examination of the "course and scope" of the agency agreement. Id. Seaton, again, presents no evidence of the terms of Allen Miller's MGA agreement with Yosemite, let alone evidence about what, if anything, Allen Miller was instructed to do for Yosemite on the Champion and Westinghouse deals.

Stalberg v. W. Title Ins. Co., 230 Cal. App. 3d 1223, 1231-32
(Cal. Ct. App. 1991) (finding that "[t]he dual agency theory
does not operate here to defeat the doctrine of imputed
knowledge," but only because the agent was not actually adverse
to the principal, therefore implying that the imputed knowledge
rule generally does not apply where there is dual agency).[8]

In short, there is no authority that the California Supreme
Court would impose constructive knowledge on a principal under

---

[8] Seaton cites language from a California agency treatise
traceable to dicta in Witty v. Clinch, 279 P. 797 (Cal. 1929):

> [W]here the agent, in the particular transaction in
> question, is acting in an adverse interest to that of
> his principal[,] . . . the attitude of the agent is
> one of hostility to the principal, and it would be
> absurd to suppose that he would communicate to the
> principal any facts within his private knowledge
> affecting the subject of his dealing, unless it would
> be his duty to do so if he were wholly unconnected
> with the principal.

Witty, 279 P. at 798 (citation and internal quotation marks
omitted) (emphasis added); accord 2B Cal. Jur. 3d Agency § 151
(2010). Seaton argues that the underlined portion creates an
exception to the prohibition on imputed knowledge in hostile
agent-principal transactions. And the exception must apply in
this case, according to Seaton, because Yosemite believes Allen
Miller would have had a duty to tell Yosemite the details of the
reinsurance program for the Champion Policy even if it were
"wholly unconnected" to Yosemite.

Setting aside the fact that Yosemite's claims are for
breach of contract, not any duty-based tort, Seaton asks too
much of Witty. Witty simply opined that it would be "absurd" to
assume an agent adverse to his principal would reveal private
facts about a deal, "unless it would be his duty to do so if he
were wholly unconnected with the principal." Witty, 279 P. at
798. However, neither Witty nor any other case the Court has
found carried that logic a step further to the conclusion that
Seaton reaches: constructive knowledge is appropriate in
situations where the agent would have such a duty.

30

these circumstances.  The Court therefore declines to take that leap, and Allen Miller's knowledge cannot serve as a means of giving "notice" to Yosemite under the retention warranties. This roadblock does not bring Seaton's claims on the Westinghouse Policy to a halt, because of the evidence discussed above.  It does, however, put an end to the "notice" argument for the Champion Certificate.

D.   Other issues

Seaton makes two other arguments as to why it is entitled to summary judgment, both of which must be rejected.

1.   Waiver

Seaton contends that Yosemite gave up the right to rely on the retention warranties in the reinsurance Certificates by ignoring the issue for more than twenty years.  Under California law, a party may be found to have waived a contractual right if "there [is] an existing right, benefit, or advantage, a knowledge, actual or constructive, of its existence, and an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right in question as to induce a reasonable belief that it has been relinquished."  Outboard Marine Corp. v. Super. Ct., 52 Cal. App. 3d 30, 41 (Cal. Ct. App. 1975).  However, in this case, the unambiguous language of the Certificates forecloses any waiver on Yosemite's part.

The retention warranties provide as follows:

> If this reinsurance is on a pro rata (or quota share)[9] basis: THE COMPANY WARRANTS THAT IT WILL RETAIN as the Company Retention the amount stipulated in Item 3 (except as noted therein). If at the time of loss Company's actual retention shall be less than the amount stipulated in Item 3, the reinsurance hereunder shall be void either from inception or when later, the date on which the reduction took place, and the Company and the Reinsurer shall each return to the other any remittances for loss or premium made following such date.

(See Def.'s Facts ¶ 16.) In other words, under the retention warranty, Yosemite's duty to provide reinsurance becomes void as of the time when Seaton drops below the stipulated retained risk. Therefore, if Seaton held too little risk "from inception," Yosemite's obligation to reinsure the Champion and Westinghouse Policies never came into being. If Seaton reduced its risk after the parties entered into the contracts, Yosemite's obligation became void on "the date on which the reduction took place."

---

[9] In reinsurance lingo, "quota share" is one way of allocating liability, and "excess of loss" is another. While the particulars of what each requires are not important, subparagraph (1) of the retention warranty sets different rules for excess of loss policies than those for quota share policies in subparagraph (2). Seaton mentions in a footnote that, although the Champion Certificate defines the "basis of acceptance" of reinsurance as quota share, Yosemite was actually billed on an excess of loss basis. (See Pl.'s Mem. in Support of Summ. J. 32 n.13, Apr. 8, 2010, ECF No. 42 (hereinafter "Pl.'s Mem.").) Seaton, however, does not carry that assertion any further. It does not develop the argument that subparagraph (1), and not subparagraph (2), governs the Champion Policy.

As a result, there is nothing for Yosemite to waive, because according to the contracts themselves Yosemite ceases to be bound the moment Seaton violates the retention warranties. The doctrine of waiver cannot be used to "create coverage where none otherwise exists." R & B Auto Ctr., Inc. v. Farmers Grp., Inc., 44 Cal. Rptr. 3d 426, 447 (Cal. Ct. App. 2006) ("The rule is well established that the doctrine[] of implied waiver . . . , based upon the conduct or action of the insurer, [is] not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom.") (citation, alteration, and quotation marks omitted). As discussed, even if the "Company Retention" box for the Champion Certificate is interpreted most favorably to Seaton, its "actual retention" was "less than the amount stipulated." (See Def.'s Facts ¶ 16, 48.) Therefore, Yosemite's duty to provide reinsurance was "void either from inception" or from the date when Seaton acquired other reinsurance, if that occurred after Yosemite delivered the Certificate. (See id.) For the Westinghouse Certificate, the issue of waiver will not arise unless a jury finds Seaton did not give notice of its other reinsurance. But assuming Seaton loses the notice argument, there will be no question that Seaton also retained less risk than it pledged to retain when Yosemite issued the Westinghouse Certificate. (See Pl.'s Facts ¶¶ 35-36.) In that event,

33

therefore, as with the Champion Certificate, Yosemite's obligation to pay reinsurance would be "void . . . from inception." (<u>See</u> Def.'s Facts ¶ 16, 48.)

Seaton baldly asserts that the warranties make the parties' contractual duties voidable, not void. However, it offers no legal authority or interpretation of the contractual terms "void . . . from inception" that demonstrates those words should not mean what they say. Nor has the Court located any California case law stating that parties may not bargain for contractual terms that, effectively, cannot be waived. <u>Cf.</u> <u>Pac. Indem. Co.</u> <u>v. Liberty Mut. Ins. Co.</u>, 269 Cal. App. 2d 793, 795 (Cal. Ct. App. 1969) (explaining that while statutory and judge-made doctrines may impose limitations, "the basic rules in insurance law still derive from freedom of contract").

For these reasons, the doctrine of waiver cannot protect Seaton's claims.

2.  The catastrophe reinsurance exception

In addition to the "notice" provision, the retention warranties contain a second safety valve that, Seaton says, allowed it to fall below the stipulated retention without voiding the Certificates. The warranty provides:

> Should the Company Retention be reduced by reinsurance or otherwise without notice to the Reinsurer (<u>except</u> <u>as the Company Retention may be covered by non-</u> <u>specific excess of loss catastrophe reinsurance</u> <u>applying to more than one of [Seaton's] policies in a</u>

<u>single event</u>), the Reinsurer's liability for loss
otherwise fully collectible hereunder shall be
determined in accordance with the following.

(<u>See</u> Pl.'s Facts ¶ 30(a) (emphasis added).) Pursuant to the
parenthetical phrase quoted above, Seaton was free to take out
"excess of loss catastrophe reinsurance" on its retained risk.
In other words, "excess of loss catastrophe reinsurance" did not
count for purposes of determining whether Seaton reduced its
stipulated retention. However, the catastrophe reinsurance
exception does not justify Seaton's additional reinsurance under
either of the Policies at issue.

For the exception to be of use to Seaton on the Champion
Policy, it would have to cover the Quota Share Excess and
Special Risks Reinsurance Treaty (the "Quota Share Treaty") that
Seaton obtained for part of the bottom $1 million layer of risk.
(<u>See</u> Ex. 22 to Cramb Aff.; Dwyer Decl. ¶ 7-9 (discussing the
reinsurance structure on the Champion Policy).) That is
because, as discussed, even interpreted most favorably to
Seaton, the Certificate required Seaton to retain the initial $1
million layer. Yet, even assuming for the sake of argument that
the Quota Share Treaty could qualify as "catastrophe"
reinsurance, it cannot satisfy any reasonable interpretation of
the exception.

By its terms, the catastrophe reinsurance exception applies
only to "excess of loss" reinsurance. As indicated in a

reinsurance glossary submitted by Seaton, "excess of loss" and

"quota share" are terms of art in the reinsurance industry that

describe two distinct methods of allocating risk.[10]   Seaton does

not argue that the Quota Share Treaty is, in fact, "excess of

loss" reinsurance, only that it resembles excess of loss

reinsurance:

> Even though the Quota Share . . . Treaty is
> called a "quota share treaty," it attaches on an
> excess of loss basis. . . . [T]he form and attachment

[10] A reinsurance glossary submitted by Seaton as an exhibit
to its motion defines the terms as follows:

> EXCESS OF LOSS REINSURANCE - A generic term describing
> reinsurance which, subject to a specified limit,
> indemnifies the reinsured company against all or a
> portion of the amount of loss in excess of the
> reinsured's specified loss retention.   The term is
> generic in describing various types of excess of loss
> reinsurance, such as per risk (or per policy), per
> occurrence (property catastrophe or casualty clash),
> and annual aggregate.
>
>          . . . .
>
> QUOTA SHARE REINSURANCE - A form of pro rata
> reinsurance (proportional) in which the reinsurer
> assumes an agreed percentage of each insurance being
> reinsured and shares all premiums and losses
> accordingly with the reinsured.   Quota share
> reinsurance is usually arranged to apply to the
> insurer's net retained account (i.e., after deducting
> all other reinsurance except perhaps excess of loss
> catastrophe reinsurance), but practice varies.   A
> quota share reinsurer may be asked to assume a quota
> share of a gross account, paying its share of premium
> for other reinsurance protecting that gross account.

Robert W. Strain, ed., Reinsurance Contract Wording 756, 775
(Strain 3d ed. 1998), (attached as Ex. 1 to Hoerrner Decl.).

> point requirement make the Quota Share . . . Treaty
> substantially similar to excess of loss cover.

(Pl.'s Opp. 44-45.) Seaton supports this position with an affirmation from its expert that the Quota Share Treaty "comport[s] with the intent of the exception" in the Certificate, because its features make it "substantially the same as the excess reinsurance referred to in the certificate warranty." (Dwyer Decl. ¶¶ 7, 7(c).)

In other words, Seaton contends the Quota Share Treaty obeys the spirit of the contract, if not its language. The Quota Share Treaty, according to Seaton's expert, is not what the Certificate warranty refers to, but only "substantially the same" as what the Certificate describes. This proclamation falls shy of creating a material dispute of fact about whether the Quota Share Treaty satisfies the exception. The question is whether the "language of the instrument is reasonably susceptible" to Seaton's interpretation. In re Tobacco Cases I, 111 Cal. Rptr. 3d 313, 321 (Cal. Ct. App. 2010) (quoting Emp'rs Reinsurance, 74 Cal. Rptr. 3d at 733). Under California law, "words in an insurance policy must be read in their ordinary sense," and courts should not reach for "a strained interpretation of the policy language." Producers Dairy Delivery Co. v. Sentry Ins. Co., 718 P.2d 920, 925 (Cal. 1986). Only under a "strained interpretation" could the words "excess

of loss . . . reinsurance" refer to insurance that is not "excess of loss," but that behaves like excess of loss coverage in some respects. Seaton therefore cannot demonstrate that the exception in the retention warranty is "reasonably susceptible" to the reading that it permits the Quota Share Treaty. See id.

That fact distinguishes this dispute from the case Seaton cites, Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33 (1st Cir. 2000). In Seven Provinces, the ambiguity of an exception to a retention warranty opened the door to the possibility that it might include quota share reinsurance:

> The policy attempted to define the types of additional reinsurance that [the plaintiff] could have without violating the net retention provision-that is, "general excess loss or excess catastrophe reinsurance." Although "excess of loss reinsurance" was a term of art that referred to a particular kind of coverage, the parties acknowledged that "general excess loss or excess catastrophe reinsurance" apparently was not a common term in the industry. Under these circumstances, the facultative reinsurance certificate was ambiguous as to whether [the plaintiff] could use quota share treaty reinsurance to cover its share of the risk of loss or whether doing so would violate the net retention requirement.

Seven Provinces, 217 F.3d at 38 (internal citation omitted). Here, the contract does not refer to "general excess loss" reinsurance, or "excess catastrophe" reinsurance. The exception uses the phrase "excess of loss" as one criterion for the catastrophe reinsurance permitted by the exception. Seven

Provinces, Seaton's expert, and the dictionary provided by Seaton all indicate that "excess of loss" is "a term of art that refer[s] to a particular kind of coverage." Id. at 38. (See Dwyer Tr. 43:23-44:3 ("[E]xcess of loss means that the limit of the contract applies above a specified retention.").) Under these circumstances, the contract is not "ambiguous as to whether [Seaton] could use quota share treaty reinsurance to cover its share of the risk," even if the Quota Share Treaty in this case mimics some aspects of excess of loss coverage. See Seven Provinces, 217 F.3d at 38.

The catastrophe reinsurance exception also does not allow Seaton to show it complied with the retention warranty for the Westinghouse Certificate. Seaton "admits that . . . the limits of the Westinghouse Policy were fully reinsured by other facultative and treaty reinsurance," (Pl.'s Disputed Facts ¶ 19), and asserts that at the time the Policy was issued, Seaton "ceded . . . $8.75M to several facultative reinsurers." (Pl.'s Facts ¶ 35.) The exception, however, does not mention "facultative" reinsurance. The broadest interpretation of the exception proposed by Seaton is that Seaton could obtain any type of "treaty reinsurance." (Pl.'s Mem. at 24; see Dwyer Decl. ¶ 6 (opining that the exception covered Seaton's "corporate reinsurance treaties").) But Seaton does not contend, and there is no basis to conclude, that treaty and

facultative reinsurance are the same for purposes of the warranty, or that treaty reinsurance might include facultative reinsurance.

The record shows that these phrases, like "excess of loss" and "quota share," are terms of art in the reinsurance industry, referring to two separate types of reinsurance contracts. The dictionary provided by Seaton gives separate definitions for the terms. <u>See</u> Robert W. Strain, ed., <u>Reinsurance Contract Wording</u> 756-58, 775 (Strain 3d ed. 1998) (attached as Ex. 1 to Hoerrner Decl.).[11] Indeed, Seaton consistently distinguishes between treaty reinsurance and facultative reinsurance. (<u>See</u> Pl.'s Facts ¶¶ 35-36 (asserting that Seaton ceded $8.75 million in risk on the Westinghouse Policy "to several facultative reinsurers" and the remaining $2 million "to Seaton's corporate reinsurance treaties"); <u>id.</u> ¶ 58(b)(iv) ("Yosemite was . . . not a participant in any 'treaty' relevant to the Champion account."); Pl.'s Mem. at 9 (arguing that Yosemite should have been aware both "that there were facultative reinsurers" and "that there was treaty reinsurance" on the Champion Policy).)

---

[11] The dictionary also defines what appears to be a hybrid: a "facultative treaty." (<u>See</u> Strain 758.) However, Seaton does not refer to that term or argue that the facultative insurance on the Westinghouse Policy was a type of hybrid.

In sum, Seaton cannot satisfy the criteria for the exception to the retention warranty, and thus cannot rely on the exception in pursuing its claims.

IV. Yosemite's counterclaims

The explanations given above for why Seaton's claims under the Champion Policy lack merit also demonstrate that Yosemite is entitled to a declaratory judgment that it owes Seaton nothing further under the Champion Policy. As for the Westinghouse Policy, Yosemite's request for a declaratory judgment depends, in part, on the outcome of the trial regarding the issue of notice. If Seaton proves that it gave Yosemite notice of its other reinsurance, Yosemite will be liable for all present and future amounts due under the Westinghouse contract. If Seaton fails to carry its burden, Yosemite will be granted a declaratory judgment that it does not have to pay any further claims under the Westinghouse Policy, for the reasons already explained.

On the other hand, all Yosemite's counterclaims seeking return of reinsurance payments, for both the Champion and Westinghouse Policies, must be dismissed, because they are barred by the "account stated" doctrine under California law. "An account stated is an agreement based on the prior transactions between the parties, that the items of the account are true and that the balance struck is due and owing from one

party to another." <u>Truestone, Inc. v. Simi West Indus. Park II</u>,

163 Cal. App. 3d 715, 725 (Cal. Ct. App. 1984) (citation and

quotation marks omitted). To prove that a debtor's payments are

an account stated, the recipient must show the following:

> that at the time of the statement an indebtedness from
> one party to the other existed, that a balance was
> then struck and agreed to be the correct sum owing
> from the debtor to the creditor, and that the debtor
> expressly or impliedly promised to pay to the creditor
> the amount thus determined to be owing.

<u>H. Russell Taylor's Fire Prevention Serv., Inc. v. Coca Cola

Bottling Corp.</u>, 99 Cal. App. 3d 711, 726. (Cal. Ct. App. 1979).

"The agreement necessary to establish an account stated

need not be express and is frequently implied from the

circumstances." <u>Maggio, Inc. v. Neal</u>, 196 Cal. App. 3d 745, 753

(Cal. Ct. App. 1987); <u>see</u> <u>Hansen v. Fresno Jersey Farm Dairy

Co.</u>, 31 P.2d 359, 362 (Cal. 1934) ("[T]he assent of the party

sought to be charged may be implied from his conduct."").

Acquiescence to the debt arises from a failure to object within

"a reasonable time," such that the law "implies an agreement

that the account is correct as rendered." <u>Maggio</u>, 196 Cal. App.

3d at 753. The question of what length of time is "reasonable"

"is one of law for the court." <u>Crane v. Stansbury</u>, 173 Cal.

631, 636-37 (Cal. 1916).

The effect of an account stated is to prevent the debtor

from disputing amounts owed. In particular, a party cannot

object on grounds that the underlying contract does not call for payment, because the account stated forms a new agreement:

> When the account is assented to, it becomes a new contract. An action on it is not founded upon the original items, but upon the balance agreed to by the parties. Inquiry may not be had into those matters at all. It is upon the new contract by and under which the parties have adjusted their differences and reached an agreement.

Gleason v. Klamer, 103 Cal. App. 3d 782, 786-87 (Cal. Ct. App. 1980) (citation and internal quotation marks omitted).

In this case, Yosemite cannot reclaim its payments under the Westinghouse and Champion Policies, because they are an account stated. For the Champion Policy, Yosemite does not dispute that, beginning in 1986 and continuing into the 1990s, "Seaton billed Yosemite and Yosemite paid approximately $447,903." (Def.'s Disputed Facts ¶ 51.) Seaton's records include four statements of account reconciliation from Seaton's claims manager directed to Yosemite setting forth what Yosemite purportedly owed under the Champion Certificate. The latest of these statements cited by Seaton is dated December 1996. (See Pl.'s Facts ¶ 55(d)(i).)

While Yosemite does not specifically admit receiving the reconciliations, the only reasonable conclusion is that it did, since Yosemite does not dispute that it paid the amounts demanded. For instance, Yosemite admits that it paid $30,555.50 in 1993, which is the amount requested in a June 1993

reconciliation addressed to Yosemite. (See Pl.'s Facts ¶¶ 55(c)(i)-(iv); Def.'s Disputed Facts ¶ 55(c)(iv).) Seaton also provides an affidavit from the person who prepared the reconciliations affirming that he followed regular procedures for communicating with reinsurers regarding claims under Seaton policies. (See Declaration of William P. Hutt, May 14, 2010, ECF No. 57 (hereinafter "Hutt Decl.").) This declaration gives rise to a "strong inference that [the correspondence] was properly addressed and mailed." Welch & Forbes, Inc. v. Cendant Corp. (In re: Cendant Corp. Prides Lit.), 311 F.3d 298, 304 (3d Cir. 2002) (applying the "mailbox rule"). Since Yosemite offers no evidence to rebut that inference, the Court is entitled to presume Yosemite received the reconciliations. Cf. Evans Cabinet Corp. v. Kitchen Int'l, Inc., 593 F.3d 135, 140 (1st Cir. 2010) ("Once the ball is in play . . . the non-moving party must come forward with competent evidence to rebut the assertion of the moving party.").

For the Westinghouse Policy, Yosemite admits that it reviewed numerous expense billings and responded with detailed questions and calculations, followed by payments. (See Pl.'s Facts ¶¶ 65, 68, 70-73, 75; Def.'s Disputed Facts ¶¶ 65, 68, 70-73, 75.) Yosemite concedes that, by December 1995, it had paid more than $17,000 on Westinghouse claims. (See Pl.'s Facts ¶¶ 70, 75; Def.'s Disputed Facts ¶¶ 70, 75.) Yosemite further

admits that, in total, it has paid $18,240.44 under the Westinghouse Certificate. (See Def.'s Facts ¶ 37; Pl.'s Facts ¶¶ 74-75.) Yosemite conducted audits of the Westinghouse file in 2001, 2003, 2006, and 2007. (See Pl.'s Facts ¶ 76; Def.'s Disputed Facts ¶ 76.)

In light of this claims correspondence and billing history, Yosemite's payments to Seaton under both Policies are accounts stated. Seaton charged Yosemite for those sums, and Yosemite not only "promised to pay," but actually paid them. H. Russell Taylor's Fire Prevention, 99 Cal. App. 3d at 726. By these actions, Yosemite agreed that "the balance struck [wa]s due and owing," and Yosemite therefore cannot now contest the amounts it has delivered. Truestone, 163 Cal. App. 3d at 725; see Weber v. Kessler, 126 Cal. App. 3d 1033, 1035 (Cal. Ct. App. 1981) (noting that a party was "estopped to deny . . . all sums paid without protest" because they were an account stated).

Yosemite complains that it did not assent to these accounts because it did not know that Seaton violated the retention warranties, but of course the point of the account stated doctrine is that Yosemite's agreement "may be implied from [its] conduct," and thereby protected from later retraction. Hansen, 31 P.2d at 362. It could not be clearer that Yosemite failed to object within a "reasonable time" to the payments, the bulk of which occurred in the 1980s and 1990s. See Maggio, 196 Cal.

App. 3d at 753. By its own account, Yosemite did not identify any problem with its liability under the Certificates until 2007 at the earliest. (See Def.'s Facts ¶¶ 34, 60.) Yosemite did, however, timely object to amounts pending and owed in the future, so the account stated doctrine is no help to Seaton for sums yet to be paid on either Policy.

Yosemite also cannot recover the billings it paid on grounds that Seaton violated the retention warranty in the Champion Certificate, and may have violated it in the Westinghouse Certificate. "Inquiry may not be had" into the terms of those documents "at all," because Yosemite's debt arises from a new contract created by the account stated.[12] Gleason, 103 Cal. App. 3d at 786-87; see Am. Home Assur. Co. v. Instituto Nacional De Reaseguros, No. 88 Civ. 0917 (CSH), 1991 WL 4461, at *4 (S.D.N.Y. Jan. 10, 1991) (rejecting a reinsurer's arguments that billings were not covered under a reinsurance treaty as precluded by the accounts stated doctrine). This is true even though Seaton's actions extinguished (or may have extinguished) Yosemite's reinsurance duties. The status of the

---

[12] Because California law forbids inquiry into what the underlying contract required once the Court finds an account stated, it is of no significance that, as Yosemite alleges, an unpublished decision from the Southern District of New York concluded that an "account stated theory cannot create liability where none existed in the first place." (Def.'s Mem. in Support of Cross Mot. for Summ. J. and Obj. to Pl.'s Mot. for Summ. J. 35, Apr. 30, 2010, ECF No. 48 (hereinafter "Def.'s Mem.").)

underlying contracts does matter for purposes of Seaton's claims, because Seaton cannot make Yosemite fulfill an obligation that no longer exists. Yosemite's claims for breach of contract, on the other hand, are blocked by the existence of separate contracts, which it cannot dispute.

In sum, Yosemite is entitled to a declaratory judgment that it owes no further payments on the Champion Policy, but it cannot recover any damages from Seaton under either Policy.

V.   Conclusion

For the foregoing reasons, the motions of both parties are GRANTED in part and DENIED in part, as follows:

1.   Yosemite is granted judgment on Seaton's claims under the Champion Policy, which are hereby dismissed.

2.   Both parties are denied judgment on Seaton's claims under the Westinghouse Policy, which must go to trial.

3.   Seaton is granted judgment on Yosemite's counterclaims for breach of contract, which are dismissed.

4.   Yosemite's counterclaims for declaratory judgments are also dismissed to the extent that Yosemite requests a declaration of entitlement to recoup payments to Seaton.

5.   Yosemite is granted a declaratory judgment that it owes nothing more to Seaton under the Champion Policy.

6.   Whether Yosemite is entitled to a similar declaratory judgment for the Westinghouse Policy depends on the outcome of the trial, so that aspect of Yosemite's motion for a declaratory judgment for the Westinghouse Policy is denied.

No Judgments shall enter until all claims are disposed of.

IT IS SO ORDERED.

*/s/ William E. Smith*
William E. Smith
United States District Judge
Date:  November 3, 2010